# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

---

In Re:

SKIPPER T. MORTON and
MEGAN J. MORTON,

**Debtors.**

**Bankruptcy Case
No. 08-40166-JDP**

---

NICKLAUS MORRARTY,

**Plaintiff,**

**vs.**

SKIPPER T. MORTON and
MEGAN J. MORTON, d.b.a.
All Star Angus,

**Defendants.**

**Adv. Proceeding No. 08-8046**

---

NICKLAUS MORRARTY,

**Third-Party Plaintiff,**
**vs**.

JOE RIGGINS, BARBARA
RIGGINS, and ALLSTAR
ANGUS

**Third-Party Defendants.**

---

MEMORANDUM OF DECISION - 1

_____

_____  |  _____

JOE RIGGINS and BARBARA
RIGGINS,

**Plaintiffs,**

**vs.**                                          **Adv. Proceeding No. 08-8047**

SKIPPER T. MORTON and
MEGAN J. MORTON,

**Defendants.**
_____

**MEMORANDUM OF DECISION**
_____

**Appearances:**

Jonathan S. Byington and Dan Green, RACINE, OLSON, NYE,
BUDGE & BAILEY, Pocatello, Idaho, Attorneys for Third-Party
Defendants Riggins.

Allen Browning, CURTIS AND BROWNING, Idaho Falls, Idaho,
Attorneys for Third-Party Plaintiff Morrarty.

## I.    Introduction and Procedural History

What was apparently intended to be a simple sale of cattle gives rise

to this complicated litigation.  In this decision, the Court deals with one

MEMORANDUM OF DECISION - 2

aspect of that contest.

Debtors Skipper and Megan Morton are cattle ranchers.  On March 6, 2008, they filed a joint petition for relief under chapter 12[1] of the Bankruptcy Code.[2]  This filing lead to a flurry of adversary proceedings growing out of dealings between Debtors, Joe and Barbara Riggins, Nicklaus Morrarty, and, indirectly, the Farm Service Agency.[3]

Two adversary proceedings were commenced on August 11, 2008, both of which deal with the dischargeability of certain debts under §§ 523(a)(2), (a)(4), and (a)(6).  Nicklaus Morrarty ("Morrarty") requests relief against Debtors in one action;[4] the second adversary was commenced by the Riggins against Debtors.[5]  These two adversary proceedings were

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101 - 1532, and all rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001 - 9037.

[2] The bankruptcy case was assigned Case No. 08-40166-JDP.

[3] One  of these actions, an adversary proceeding between Farm Service Agency and Debtors examining the dischargeability of a debt owed by Debtors to FSA has been dismissed.  *See* Docket No. 9 in Adv. Proceeding No. 08-8036.

[4] *See* Docket No. 1 in Adv. Proceeding No. 08-8046.

[5] *See* Docket No. 1 in Adv. Proceeding No. 08-8047.

MEMORANDUM OF DECISION - 3

consolidated pursuant to the Court's pretrial order entered on October 9, 2008.  Docket No. 20, Adv. Proceeding No. 8046.[6]

Debtors filed an answer and counterclaim in the Morrarty action on September 2, 2008.  Docket No. 6.  Morrarty replied to the counterclaim, then on September 24, 2008, he filed a third-party complaint against the Riggins and Allstar Angus.  In his third-party complaint, Morrarty alleged four separate claims for relief for breach of contract, conversion, fraud, and the violation of the Idaho Uniform Commercial Code in connection with a cattle sale.[7]  Docket No. 11.  On October 29, 2008, the Riggins answered the third-party complaint and asserted a counterclaim against Morrarty. Docket No. 21.  Morrarty replied to that counterclaim on November 18, 2008.  Docket No. 26.

Following a pretrial conference on January 13, 2009, the pleadings

---

[6] Unless otherwise indicated, all remaining references to the Court's docket are entries in Adv. Proceeding No. 08-8046 and will be denoted simply as "Docket No. ___".

[7] Under certain circumstances, the Federal Rules of Civil Procedure allow for a plaintiff to bring in a third party when a claim has been asserted against the plaintiff.  *See* Fed. R. Civ. P. 14(b), as incorporated by Rule 7014.

MEMORANDUM OF DECISION - 4

were deemed settled, and three days in June were scheduled for trial.

Docket No. 35.  On April 7, 2009, the Riggins moved for summary

judgment as to the Morrarty third-party complaint claims for breach of

contract, conversion, and UCC violations.[8]  Docket No. 39.  The motion was

set for hearing on May 5, 2009.  Morrarty did not file a response to the

motion until the day before the hearing, in contravention of LBR

7056.1(b)(2).[9]  At the hearing, counsel for the Riggins moved to strike that

tardy response.  Rather than strike the response, the Court, in the exercise

of its discretion under LBR 7056.1(d), granted the Riggins ten days

following the conclusion of the hearing to reply to Morrarty's response.

They did so on May 15, 2009.  Docket No. 54.  To accommodate the Riggins'

---

[8] Counsel for the Riggins conceded that there may be an issue of material fact with respect to the third count in Morrarty's third-party complaint pertaining to fraud, and as a result, summary judgment on that count would be inappropriate.

[9] The Local Rules require a party opposing a motion for summary judgment to file a responsive brief, and a statement of disputed and undisputed facts, at least fourteen days prior to the hearing.  If desired, the opposing party may also file affidavits or other materials at least fourteen days prior to the hearing.  *See* LBR 7056.1(b)(2).

MEMORANDUM OF DECISION - 5

need for additional time to reply, the Court vacated the first trial date.[10]

Also at the hearing, and pursuant to the oral stipulation of the

parties, Morrarty agreed to withdraw the first count of his third-party

complaint alleging a breach of the original sale contract.  The Court

approved that oral stipulation, and an order dismissing that claim was

entered on May 11, 2009.  Docket No. 51.

After arguments, the Court took the Riggins' motion concerning the

conversion and UCC counts in Morrarty's third-party complaint under

advisement.  Having now reviewed the record, the arguments of the

parties, and the applicable law, the Court concludes that Riggins' motion

should be granted.

## II.   Facts

The following facts appear undisputed in the record.

### A.   Allstar Angus Partnership

In 1996, the Riggins and the Mortons formed a partnership, which

---

[10]  The trial on the remaining issues in these proceedings will be held on
June 25 and 26, and then continued on July 27, 2009.  The deadlines to file
motions and complete discovery as set forth in the Court's pretrial order, Docket
No. 35, remain unchanged.

MEMORANDUM OF DECISION - 6

they called Allstar Angus ("Allstar"), for the purpose of establishing and

raising a herd of purebred Black Angus cattle.  Under their agreement, the

Riggins contributed twenty purebred, registered Black Angus cows to

Allstar.  The Mortons contributed no cattle to the partnership, but were to

be responsible for the day-to-day operation of the partnership, including

caring for and growing the herd.  At some point after the partnership was

formed, the Riggins and the Mortons signed a partnership agreement that

was intended to memorialize the terms and conditions of the parties'

relationship and to identify the partners' respective interests in the

partnership.  *See* Docket No. 41, Ex. A.[11]

        According to that agreement, the Mortons agreed to take possession

of the Allstar herd, and to keep the herd and all calves born into the herd

segregated from any other cattle they owned or possessed.  All partners

had equal rights in the management of the partnership, but Skipper was to

act as the general manager, and he had the authority to conduct the day-to-

---

        [11]  This document was signed by all of the partners, but never dated.
However, the first page of the agreement notes that it was "made and entered
into this ___ day of June, 2000[.]"  The precise day the agreement was executed is
immaterial here.

MEMORANDUM OF DECISION - 7

day affairs of the partnership.  Notwithstanding this position, however,

Skipper did not have unfettered authority to sell or encumber partnership

property.  The female calves born into the herd or acquired by Allstar were

to be owned equally by all partners and could not be sold or encumbered

without the consent of the partners.  However, both Skipper and Megan

were authorized, without the consent of the Riggins, to sell all bull calves

which were born into the Allstar herd.

The proceeds from the sale of bull calves were to be used to pay the

operating and other expenses of the Allstar partnership.  If a surplus

remained after payment of all expenses, the Mortons were entitled to retain

those funds.  On the other hand, if the proceeds from those sales were

insufficient to pay partnership expenses, the Mortons were personally

responsible to timely pay such expenses from their own funds, without any

right of reimbursement from Allstar or the Riggins.

In addition to their involvement in Allstar, the Mortons were also

doing business as Morton Land and Livestock and owned their own cattle.

Unbeknownst to the Riggins, the Mortons established a business bank

MEMORANDUM OF DECISION - 8

account at the Bank of Commerce in the name of "Morton Land and

Livestock, Allstar Angus, and Skipper or Megan Morton."  *See* Docket No.

41, Ex. B.[12]  Unfortunately, the Mortons commingled their personal funds

with those of Allstar and Morton Land and Livestock in this account, and

used funds from that account to pay for expenses for each of these separate

operations.  More importantly, the Mortons also intermingled the Allstar

herd with their personal cattle and those owned by others who were

leasing pasture land from the Mortons.

### B.    Sale Agreement Between Skipper and Morrarty

In the spring of 2006, Morrarty approached Skipper and expressed an

interest in purchasing some cattle.[13]  In a conversation occurring during a

meeting of the men at the Mortons' ranch, responding to Morrarty's

inquiry whether Skipper had cattle to sell, Skipper gestured to the

intermingled herd and told Morrarty that those cows were for sale.

---

[12]  The Riggins do not contest that the Mortons had the authority under the
partnership agreement to open a business checking account on behalf of Allstar
and to use such an account to conduct the affairs of the partnership.

[13]  Morrarty was not particular about whether the cattle he hoped to
purchase were purebred or not.

MEMORANDUM OF DECISION - 9

Skipper explained to Morrarty that he owned some of the cows, and the others were owned by a third party who was willing to sell.  Skipper did not identify who the other owner of the cattle was at that time.  Morrarty later discovered that the other owner was Richard Schwartz.  Morrarty agreed to purchase some of the herd, and explained he would arrange his financing for the deal through a loan from Farm Service Agency.  No written sale agreement was prepared at that time.

At some later time, Skipper and Morrarty prepared a handwritten document memorializing their agreement.  This crude contract provided:

> I Skipper Morton sold Nick Morrarty 125 head of crossbreed [sic] cow calf pairs on May 8th, 2006 for $1,000.00 and 4 angus bulls for $2,000.00 a head.  Plus transportation cost at $4,500.00. Cattle are branded with $^{14}$ on left shoulder.

Docket No. 41, Ex. C.  Skipper and Morrarty both signed this document.[15]

_____

[14]  The "⌒" symbol is not the Allstar brand.  It is the brand of the Idaho Livestock Auction, in which Richard Schwartz is a general partner.  *See* Docket No. 41, Ex. C.  Allstars' brand was described as a "starburst" which was also placed on the left shoulder of the animal.

[15]  The date "5/8/06" appears next to the signature of Skipper.  The exact date that Morrarty signed the agreement is unclear, though it is undisputed that it occurred some time later.  While there may be an issue of fact as to when his signature was obtained, the precise time this agreement was executed is not

MEMORANDUM OF DECISION - 10

Morrarty believed that he was purchasing cows that belonged to Skipper and Richard Schwartz. On May 9, 2009, Morrarty delivered a certified check to Skipper for $117,500 made payable solely to "Skipper Morton." In addition to this check, Morrarty provided other services and paid other bills for Skipper.

Skipper deposited the Morrarty purchase check into the Bank of Commerce account. Skipper then authorized the bank to apply those funds to pay down his operating loan with the bank.

Before Skipper could deliver the cattle to Morrarty, an individual working with Richard Schwartz loaded up the 125 cow/calf pairs from the herd and sold them to an out-of-state buyer. Over the next several months, Skipper made several transfers of cattle to Morrarty in an attempt to substitute for the cattle that he intended to sell to Morrarty under their earlier agreement. Several of those cows were branded with the Allstar "starburst" brand.

_____

material here.

MEMORANDUM OF DECISION - 11

### C.    The Global Settlement

In March 2007, the Riggins first learned that Skipper had transferred some of the Allstar cattle to Morrarty.  Prior to that time, Morrarty had never heard of the Riggins, nor was he aware of their connection with the cattle he had received from Skipper.  Joe Riggins informed Morrarty that Skipper did not have the right to transfer the Allstar cattle.

On March 23, 2007, the Mortons, the Riggins, and Morrarty all met to discuss a proposed settlement among the parties.  A three-way deal was negotiated.  Pursuant to this arrangement, Morrarty agreed to transfer all of the cows he possessed with the Allstar brand to the Riggins.  The Riggins in turn agreed Morrarty could sell the other cattle which he obtained from Skipper free and clear of the Riggins' claims of ownership or security interests in them.  Finally, the Mortons agreed to provide 84 cows to Morrarty, along with pasture and feed, before the end of April, 2007.

Morrarty and the Riggins have fully performed their obligations under this settlement agreement.  However, the Mortons have not.  They did not deliver any cattle to Morrarty, nor did they provide the pasture and

MEMORANDUM OF DECISION - 12

feed required by the settlement agreement. In October, 2007, Morrarty

sued the Mortons and the Riggins.

On March 6, 2008, the Mortons filed their petition for relief under

chapter 12 of the Bankruptcy Code. This litigation ensued.

## III.    Discussion and Disposition

### A.    Summary Judgment Standards

A motion for summary judgment is addressed under Fed. R. Bankr.

P. 7056, which incorporates Fed. R. Civ. P. 56. The standards guiding the

Court in consideration of a motion for summary judgment are well settled.

Summary judgment may be granted if, when the evidence is viewed in a

light most favorable to the nonmoving party, there are no genuine issues of

material fact and the moving party is entitled to judgment as a matter of

law. Fed. R. Civ. P. 56(e), incorporated by Fed. R. Bankr. P. 7056; *Leimbach*

*v. Lane (In re Lane)*, 302 B.R. 75, 81 (Bankr. D. Idaho 2003) (citing *Far Out*

*Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001)).

Further, the Court does not weigh the evidence in considering

summary judgment. It determines only whether a material factual dispute

MEMORANDUM OF DECISION - 13

remains for trial. *Leimbach*, 302 B.R. at 81 (citing *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997)). An issue is "genuine" only if there is sufficient evidence for a reasonable fact finder to find in favor of the non-moving party, and a fact is "material" if it might affect the outcome of the case. *Far Out Prods.*, 247 F.3d at 992 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)).

The initial burden of showing there is no genuine issue of material fact rests on the moving party. *Esposito v. Noyes (In re Lake Country Invs.)*, 255 B.R. 588, 597 (Bankr. D. Idaho 2000) (citing *Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir. 1998)). If the non-moving party bears the ultimate burden of proof on an element at trial, that party must make a showing sufficient to establish the existence of that element in order to survive a motion for summary judgment. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

### B.    Conversion

The conversion count in Morrarty's third-party complaint against the Riggins invokes an amalgam of tort and partnership principles. In this

MEMORANDUM OF DECISION - 14

claim, Morrarty argues that Allstar, through the acts of its partner Skipper,

converted Morrarty's money by wrongfully depositing the $117,500 in

purchase proceeds into the Allstar bank account, and by then using the

money to pay down Allstar debt. Morrarty argues that because this

wrongful act was committed by an Allstar partner (*i.e.,* Skipper) in the

ordinary course of the partnership business, liability may be imputed to the

Riggins under Idaho Code § 53-3-305.[16]

Morrarty's reference to Idaho's version of the Uniform Partnership

Act in this context is misplaced. Under the undisputed facts it is clear that

Skipper wore several hats: he owned his own cattle, he operated Morton

Land and Livestock, and he was a partner in Allstar. As a partner in

Allstar, Skipper did sell bull calves from time to time to pay for partnership

---

[16] Idaho Code § 53-3-305 provides:
(a) A partnership is liable for loss or injury caused to a person, or
for a penalty incurred, as a result of a wrongful act or omission, or
other actionable conduct, of a partner acting in the ordinary course
of business of the partnership or with authority of the partnership.
(b) If, in the ordinary course of the partnership's business or while
acting with authority of the partnership, a partner receives or
causes the partnership to receive money or property of a person not
a partner, and the money or property is misapplied by a partner,
the partnership is liable for the loss.

MEMORANDUM OF DECISION - 15

expenses.  However, the Morrarty deal was not such a sale.  It was

indisputably a sale of cattle between Morrarty and Skipper, acting in his

individual capacity.  In all of the conversations between Skipper and

Morrarty leading up to the sale, and in the documents prepared to

memorialize the transaction, no mention is ever made of the Allstar

partnership or Allstar's cattle.  The mere fact that Skipper was also a

partner in Allstar, or that he chose to deposit the $117,500 check into an

account which he used for Allstar purposes is insufficient to render Allstar

a party to the transaction, or to implicate the provisions of the Uniform

Partnership Act.  Simply put, in all respects, Morrarty dealt with Skipper,

not Allstar.[17]

     While the Court concludes that Allstar is not liable to Morrarty under

Idaho Code § 53-3-305, to be thorough, additional comments about the

---

[17] It would appear that Morrarty has conceded this point.  In response to
the Riggins' summary judgment motion, Morrarty agreed that "Allstar Angus
was not a party to the initial sale of cattle from Skipper Morton to Nick
Morrarty[.]" Docket No. 49, pp. 3-4.  Morrarty then stipulated to withdraw the
first count of his third-party complaint against the Riggins in which he alleged
they had breached the initial sale contract.  To now argue that Skipper was acting
on behalf of the partnership is perplexing, to say the least.

MEMORANDUM OF DECISION - 16

conversion claim are in order.  In Idaho, conversion is defined as a "distinct act of dominion wrongfully asserted over another's personal property in denial of or inconsistent with rights therein." *Peasley Transfer & Storage Co. v. Smith*, 979 P.2d 605, 616 (Idaho 1999).  Several key elements of an actionable conversion are missing here.

No doubt, Skipper engaged in several acts of dominion with respect to the $117,500 Morrarty purchase check.  However, to constitute a conversion, an act of dominion over property by itself is insufficient – the dominion must be wrongfully asserted.

Skipper's first act of dominion was accepting the check from Morrarty.  Skipper certainly took possession of the check, but it can not be said that he did so wrongfully.  After all, Morrarty voluntarily delivered the check to Skipper pursuant to their sale agreement.  There can be no conversion where the taking of property is with the consent or authorization of the plaintiff.  *Haynes v. Kettenbach Co.*, 81 P. 114 (Idaho 1905).  Thus Skipper's mere possession of the check was not a wrongful act of dominion.

MEMORANDUM OF DECISION - 17

A second act of dominion occurred when Skipper deposited the

check into the business bank account at the Bank of Commerce.  It is

undisputed that Skipper used this account for all of his business

transactions, including those of Allstar and Morton Land and Livestock.

However, when Morrarty tendered the check, he did not give Skipper any

special instructions with respect to depositing or otherwise negotiating the

check.  Likewise, the check itself did not contain any special endorsements

or restrictions.  Skipper was the sole payee.  Under these circumstances,

Skipper was therefore authorized to negotiate the check, including by

depositing it into the Bank of Commerce checking account. Doing so was

not wrongful.

After the check was deposited, Skipper directed the bank to apply

the funds to an operating loan which he had incurred earlier.  This was

Skipper's ultimate act of dominion with respect to the check and the money

it represented.  However, these instructions were neither wrongful, nor

inconsistent with Morrarty's rights in the check.  By this point, the $117,500

check was no longer Morrarty's property.  Because a conversion requires an

MEMORANDUM OF DECISION - 18

act of dominion wrongfully asserted over *another's property*, Skipper's instructions to the bank were not tortuous.

The Riggins are entitled to summary judgment dismissing count two of Morrarty's third-party complaint alleging that they are responsible for conversion.

### C.    Violation of the Uniform Commercial Code

Count four in Morrarty's third-party complaint alleges that the "actions" of the Riggins and Allstar "constitute violations of the Uniform Commercial Code, including but not limited to [Idaho Code] Sections 28-2-301, 28-2-312, 28-2-713, 28-2-721."  Docket No. 11.  Unfortunately, though, Morrarty does not identify which "actions" he is referring to, or which transaction is at issue.[18]  In his response to the summary judgment motion and at the hearing, Morrarty attempted to clarify that this claim for relief relates solely to the settlement agreement between the Riggins, the

---

[18] The Riggins apparently had interpreted this count to implicate only the initial sale transaction between Skipper and Morrarty, as their memorandum in support of summary judgment merely recites that neither the Riggins nor the Allstar partnership were parties to or associated with that sale, and as such, the Riggins were entitled to summary judgment.

MEMORANDUM OF DECISION - 19

Mortons, and Morrarty which occurred in March 2007.

Under their settlement agreement, Morrarty agreed to turn over all of the cattle in his possession with the Allstar brand to the Riggins, and the Mortons agreed to replace those cattle within the next forty-five days. For their part, the Riggins agreed that they would not assert any ownership or security interests in the other cows that Morrarty possessed which were connected to the earlier sale between Skipper and Morrarty. Morrarty argues that he fully performed his obligations under the settlement agreement, but that he never received the replacement cattle he was promised in return. As a result, he claims he is entitled to cancel the transfer of cattle which he had made to the Riggins and to recover his consequential damages. The Court disagrees.

The statutes referenced by Morrarty in this count of his third-party complaint outline the obligations of buyers and sellers of goods under the Idaho Uniform Commercial Code, and identify some of the remedies available to buyers when sellers breach a sales contract or engage in fraud. In particular, Morrarty notes that it is the seller's duty to transfer and

MEMORANDUM OF DECISION - 20

deliver goods, and the buyer's duty to accept and pay for those goods, in accordance with their contract.  Idaho Code § 28-2-301.  A buyer is defined as a person who buys or contracts to buy goods, and a seller is defined as a person who sells or contracts to sell goods.  Idaho Code § 28-2-103.

Morrarty concedes that neither Allstar nor the Riggins were parties to the original sale transaction and Morrarty consented to dismissal of the breach of contract count in his third-party complaint.  *See* Docket Nos. 49, 51.  Nonetheless, Morrarty maintains that he is entitled to recover the cattle that he transferred to the Riggins pursuant to the settlement agreement.

Although the Riggins became intricately involved in this transaction in its late stages, they were neither buyers nor sellers.  When the original sale went awry, Skipper attempted to transfer certain Allstar cattle in an effort to satisfy his personal obligation to Morrarty.  Only after the Riggins learned of that fact did they become involved in an attempt to "fix the mess," and settlement negotiations ensued.  In the end, the Riggins received a number of cattle back from Morrarty that were admittedly Allstar livestock.  The Mortons agreed to replace those cattle.

MEMORANDUM OF DECISION - 21

None of the settlement dealings transform the Riggins into sellers under the original contract; that role was played by Skipper, and Morrarty had acknowledged this fact.  As a result, neither Idaho Code § 28-2-713 or § 28-2-721 allow Morrarty to recover from the Riggins.  Idaho Code § 28-2-713 accords a remedy to a buyer who suffers from a breach by the seller. Because the Riggins were not the sellers in this instance, Morrarty cannot recover damages from them under this provision.  Idaho Code § 28-2-721 merely provides that remedies for material misrepresentation or fraud include all of the remedies available for a nonfraudulent breach.  Because the Riggins were not parties to the contract, they made no representations to Morrarty, nor could they have breached the sales contract.

The Riggins are entitled to summary judgment on count four of Morrarty's third-party complaint.

## IV.   Conclusion

Viewing the evidence in the light most favorable to Morrarty, as it must, the Court finds that there are no genuine issues of material fact and the Riggins are entitled to judgment as a matter of law dismissing

MEMORANDUM OF DECISION - 22

Morrarty's claims against them for conversion (count two) and violation of

the Idaho Uniform Commercial Code (count four).  A separate order will be

entered.

Dated:  June 9, 2009

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge

MEMORANDUM OF DECISION - 23